Filed: 8/30/19

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ALYCESUN DALEY,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.,<br><br>    Defendants and Respondents. | A153501<br><br>(San Francisco City and County Super. Ct. No. CGC-15-544501) |

Alycesun Daley (Daley) appeals from a judgment entered after the trial court dismissed her case as time-barred. She contends the court erred because the discovery rule postponed the accrual of her medical battery cause of action (and the start of the limitations period under Code of Civil Procedure section 335.1) for several years. Respondents disagree and, by cross-appeal, contend that Daley's claims actually sound in professional negligence, so they are time-barred anyway under Code of Civil Procedure section 340.5, which explicitly restricts the time to bring an action to three years after injury under the circumstances of this case.[1]

We will reverse the judgment. In the published portion of our opinion, we explain that the trial court erred to the extent it concluded that the discovery rule is inapplicable to medical battery claims as a matter of law. In the non-published portion of the opinion, we find no basis in the record for concluding that Daley's claim cannot sound in battery.

---

[*]    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.B.

[1]    Respondents and cross-appellants are The Regents of the University of California (Regents), Diana Farmer, M.D., Hanmin Lee, M.D., and Robert Ball, M.D. Unless indicated otherwise, all statutory references hereafter are to the Code of Civil Procedure.

1

# I. FACTS AND PROCEDURAL HISTORY

## A. Daley and TTTS

In April 2003, Daley learned that she was pregnant with twins. Her physician at the University of Utah Medical Center informed her that she had a condition called twin-twin transfusion syndrome (TTTS), which is a congenital condition involving a circulation abnormality in twins growing from a single placenta. In essence, blood is unevenly transfused by intertwin vascular connections from the "donor" twin to the "recipient" twin; one twin receives too much circulation and fluid, and the other twin does not receive enough. Over time, the recipient twin develops a form of heart failure, while the donor twin stops growing.

Standard therapy for TTTS in the United States has been amnioreduction, which removes amniotic fluid from the recipient fetus by inserting a needle into the amniotic sac. Daley underwent amnioreduction in Utah, but it did not successfully treat her TTTS.

Daley thereafter agreed to participate in a national clinical trial sponsored by an institute of the National Institutes of Health (NIH). The trial was designed to evaluate the efficacy of selective fetoscopic laser surgery in treating TTTS, by comparing its effects against the effects of amnioreduction.

The University of Utah conducted the formal informed consent process for Daley's enrollment into the study. Daley reviewed and signed a consent form to participate in the "prospective randomized multicenter trial of amnioreduction vs. selective fetoscopic laser for the treatment of twin-twin transfusion syndrome." The consent form explained that she would receive either a treatment of serial amnioreductions or a treatment of laser ablation of blood vessels inside the uterus. The form described amnioreduction as a procedure during which "a needle [is used] to draw off fluid from the bag of water." It described "[s]elective fetoscopic laser photocoagulation" as "the use of a laser beam to block or seal the vessels (photocoagulate) on the surface of the placenta so that the twins can no longer share the vessels," to be performed by "using an instrument inserted through the mother's

2

abdominal wall into the amniotic sac called a fetoscope." The form further explained, "[a] 4-mm (about 4 inches) incision is made in the skin to allow ultrasound-guided placement of a 4-mm narrow tube into the amniotic sac." (Four millimeters is not "about 4 inches," but less than one-sixth of an inch.) The procedure was to be performed at the Fetal Treatment Center (FTC) of the University of California-San Francisco (UCSF).

B. Surgeries at UCSF

Of critical importance in this case—and the focus of Daley's allegations of battery—are the means by which surgeons might gain access to the placenta through the uterus to perform the laser ablation of the blood vessels. Daley contends that selective fetoscopic laser surgery for TTTS is "percutaneous," in that a narrow 4mm tube (trocar) is *punctured* through a 4mm incision in the mother's abdomen and into the uterus to access the placenta; a fetoscope is then used to laser-coagulate certain connecting vessels on the surface of the placenta, which seals the vessels and cures the TTTS. *Open* fetal surgery, as alleged here, is different: instead of a 4mm puncture, the surgeons make a two-inch (or longer) incision through the mother's abdomen to expose the uterus (laparotomy), suture the uterus, make incisions into the uterus, and expand a 5mm radial trocar to *open* the uterus (hysterotomy); the connecting vessels on the placenta are then laser-coagulated to cure the TTTS. Daley contends the performance of open fetal surgery on study patients violated NIH protocol, the consent forms, and UCSF hospital policy.[2]

1. First Laser Ablation

Dr. Diana Farmer performed the first laser ablation procedure on Daley on July 31, 2003. Dr. Farmer recalled having a detailed discussion with Daley about the procedure, the risks, and the alternatives. Daley also signed an authorization form for Dr. Farmer to perform the laser ablation. The form did not specify the details of the procedure, such as the way the placenta would be accessed.

---

[2]     We note that the consent form advised: "In rare instances in which we are unable to see the surface of the placenta, a laparotomy (opening of the abdomen) to expose the uterus may be necessary." The form did not mention open "hysterotomy."

Rather than performing percutaneous laser surgery, Dr. Farmer, assisted by Dr. Ball, allegedly performed an open laparotomy and open hysterotomy, followed by laser ablation of the inter-twin vascular connections. Specifically, Dr. Farmer made a 3–4 inch incision in Daley's abdomen to expose the uterine wall, placed two stay sutures under ultrasound guidance into the wall, and inserted a trocar into her uterus. According to hospital records, two arterial venous anastomoses (connected blood vessels) were identified and cauterized with the laser until no blood flow could be seen in the vessels from the donor twin to the recipient twin, but the procedure was terminated after Dr. Farmer believed she observed chorioamnionic separation. The surgery had been complicated by significant uterine bleeding, and it was not successful in resolving the blood flow that caused the TTTS.

Dr. Ball informed Daley that the physicians were willing to offer the surgery a second time because, in Daley's words, "there were things that they had learned in the first surgery and they could improve on it in the second surgery." Dr. Farmer told Daley that Dr. Hanmin Lee would attempt to gain access through the incisions she had made during the first procedure and would try again to ablate the vessels that were causing the TTTS. Daley signed an authorization form to "redo laser ablation for persistant [sic] TTTS."

### 2. Second Laser Ablation

On August 7, 2003, Dr. Lee, assisted by Dr. Ball, performed the second laser ablation surgery on Daley, again by laparotomy. Dr. Lee made an incision through the old laparotomy incision, placed a 5-mm trocar through the same site in the uterus, and laser-ablated an artery coming from the donor twin. This second procedure was successful in modifying the blood flow to the twins.

### C. Death of Daley's Twins

Daley returned to Utah for the remainder of her pregnancy care. In August 2003, and allegedly as a result of the procedures the FTC surgeons at UCSF performed, Daley developed a bacterial infection of the membranes surrounding the fetus

4

(chorioamnionitis) and the membranes ruptured prematurely. Delivery of the twins was induced, and neither twin was able to survive outside the womb.

### D. Daley's Complaint

About 11 years later in September 2014, Daley saw a posting on Facebook by The Killino Firm, P.C. (her current attorneys), asking mothers who participated in the NIH TTTS trial at UCSF to call the firm. Daley responded and, in March 2015, filed her lawsuit against Dr. Farmer, Dr. Lee, Dr. Ball, and the Regents.

#### 1. Daley's Allegations

Daley asserted claims against the individual doctors for medical battery and intentional infliction of emotional distress, and alleged that the Regents were liable under a theory of respondeat superior. According to her complaint, Daley had consented to a percutaneous surgery (with access to the organs established by a needle puncture), but defendants instead performed an open laparotomy and open hysterotomy, procedures to which she did not consent (or which were substantially different than the procedures to which she consented). Daley alleged that, as a result of the performed procedures, she suffered preterm labor, chorioamnionitis, fetal deaths, and physical and emotional pain.

#### 2. Respondents' Demurrer

Respondents filed a demurrer to Daley's complaint, contending that Daley failed to allege facts sufficient to state a cause of action for medical battery or intentional infliction of emotional distress. Specifically, respondents urged that medical battery requires proof of a procedure that was substantially different than the procedure to which the patient consented, and the complaint did not contain facts showing that the laser ablations performed on Daley were substantially different than the laser ablations to which she agreed. Respondents added that Daley failed to allege facts that would toll the two-year statute of limitations for battery (§ 335.1), and that the claim for intentional infliction of emotional distress was time-barred as well. Daley filed an opposition. The court overruled the demurrer.

5

### 3. Respondents' Summary Judgment Motion

Respondents filed a motion for summary judgment in June 2016, asserting (1) Daley could not prove a claim for battery because there was no evidence a health care provider intentionally deviated from what the physician subjectively believed Daley consented to; (2) the statute of limitations for medical negligence (§ 340.5) applied to bar Daley's action, because her claim that an incision rather than a puncture was used during laser ablation procedures was not really one for battery, but for medical negligence in how professional services were performed; and (3) Daley could not prove intentional infliction of emotional distress.[3]

Daley opposed the motion. In support of her battery theory, Daley pointed to her testimony that she had no complaints about the manner in which the procedures were performed, but complained that she "signed up for the non-invasive surgery being evaluated in the NIH study, but, instead, she got something completely different." Specifically, "there was no consent to perform laparotomies or hysterotomies, and . . . the surgery performed was substantially different than the one to which she consented." Daley argued that respondents fraudulently concealed that they performed a different procedure and the discovery rule applied to postpone the accrual of her claims.

The court denied respondents' summary judgment motion, finding triable issues of fact as to whether respondents performed medical procedures without Daley's consent, whether the performed procedures were substantially different than the procedures for which Daley gave consent, and whether the "statute of limitations" was tolled based upon delayed discovery or intentional concealment.

---

[3]    As discussed *post*, section 335.1, applicable to battery, provides a two-year limitations period and is silent as to when the period begins; section 340.5, applicable to professional negligence by healthcare providers, essentially provides a limitations period of up to three years after the date of injury, extended beyond three years only in cases of intentional concealment and other circumstances not present here.

6

4. Order of Dismissal

Shortly before the September 2017 date for a bifurcated trial on statute of limitations issues, respondents filed a trial brief asserting that Daley's complaint was time-barred on two alternative grounds: (1) Daley's claim was really for professional negligence, so the applicable statute of limitations was section 340.5, which provided only a three-year limitations period under the facts of the case; and (2) even if Daley's claim was for medical battery and was governed by the statute of limitations of section 335.1, the discovery rule—which can postpone the accrual of a cause of action and the running of a limitations period—could not extend section 335.1's two-year limitations period. Daley served an opposing brief, and respondents served a supplemental brief.

On September 14, 2017, the trial judge concluded that Daley's claim was for medical battery, but agreed with respondents that the discovery rule did not apply to medical battery claims and the limitations period of section 335.1 could be tolled only by proof of fraudulent concealment. On that basis, the court announced it would not allow evidence of delayed discovery at the statute of limitations trial, but it would allow Daley to proceed to the statute of limitations trial under a fraudulent concealment theory. Daley chose not to do so. As a result, the court indicated Daley's action would be dismissed.

Daley's complaint was dismissed with prejudice by written order on October 26, 2017. Daley's appeal, and respondents' cross-appeal, followed.

II. DISCUSSION

Responsive to the trial court's ruling, we first consider whether the limitations period for medical battery is subject to the discovery rule. We then consider respondents' cross-appeal.

A. Limitations Period for Medical Battery

"A battery is any intentional, unlawful and harmful contact by one person with the person of another." (*Ashcraft v. King* (1991) 228 Cal.App.3d 604, 611.) The contact is unlawful for purposes of battery if it was not consented to. (*Ibid.*) Thus, "[w]here a doctor obtains consent of the patient to perform one type of treatment and subsequently

7

performs a substantially different treatment for which consent was not obtained, there is a clear case of battery." (*Cobbs v. Grant* (1972) 8 Cal.3d 229, 239 (*Cobbs*).)

Section 335.1 sets forth a two-year limitations period for actions based on "battery, or injury to, or for the death of, an individual caused by the wrongful act or neglect of another." This two-year period begins to run when the cause of action accrues. (§ 312.)

Generally, a cause of action accrues " 'when, under the substantive law, the wrongful act is done,' or the wrongful result occurs, and the consequent 'liability arises.' " (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397 (*Norgart*).) Here, it is undisputed that the allegedly wrongful acts and result occurred in 2003, nearly 12 years before Daley filed her complaint.

As an exception to the general rule of accrual, however, the discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." (*Norgart, supra,* 21 Cal.4th at p. 397.) A plaintiff has reason to discover a cause of action when he or she " 'has reason at least to suspect a factual basis for its elements.' " (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807 (*Fox*).) Under this standard, accrual does not wait until the plaintiff knows facts supporting each specific legal element of the cause of action; it occurs when the plaintiff has "reason to at least suspect that a *type of wrongdoing has injured them*." (*Ibid.*, italics added.) "In other words, plaintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation." (*Id.* at p. 808.)

1. <u>The Discovery Rule Applies to Medical Battery Claims</u>

Section 335.1, defining the limitations period for battery, does not specify whether commencement of the period may be postponed due to the plaintiff's lack of discovery. While the discovery rule is sometimes expressly incorporated in some form into a statute (see, e.g., § 340.5), it may also be applied by the courts based on common law. (*Norgart, supra,* 21 Cal.4th at p. 397.) In fact, courts have often been the first to announce the

8

application of the discovery rule to a genre of claims, with the Legislature later codifying the rule into a statute. (*Moreno v. Sanchez* (2003) 106 Cal.App.4th 1415, 1429–1430.)

Where a statute is silent as to the accrual of a cause of action, there is a "presumption in favor of permitting settled common law accrual rules to apply," including equitable exceptions to the general rule. (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1193.) Put another way, " ' "[u]nless expressly provided, statutes should not be interpreted to alter the common law, and should be construed to avoid conflict with common law rules." ' " (*Ibid.*)

Historically, California courts have applied the discovery rule to a broad range of claims. Nearly five decades ago, our Supreme Court ruled that "a cause of action for legal malpractice does not accrue until the client discovers, or should discover, the facts establishing the elements of his cause of action" under section 339. (*Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 194.) Moreover, multiple cases have applied the discovery rule to the limitations period set forth in former section 340, subdivision (3), which is the predecessor statute to section 335.1.[4] (E.g., *Cain v. State Farm Mut. Auto. Ins. Co.* (1976) 62 Cal.App.3d 310, 315 [discovery rule applied to a claim for invasion of privacy under former § 340, subd. (3)]; *Manguso v. Oceanside Unified School Dist.* (1979) 88 Cal.App.3d 725, 731 [discovery rule applicable to claim for libel under former § 340, subd. (3)]; *Fox, supra,* 35 Cal.4th 797, 809 [discovery rule delayed accrual of product liability claim (under negligence or strict liability theories) under former § 340, subd. (3), where plaintiff had commenced a medical negligence action and was unaware until deposition that a device malfunctioned during surgery]; see also *Larcher v. Wanless* (1976) 18 Cal.3d 646, 654 [although former § 340, subd. (3) did not identify the event triggering the limitations period, the statute of limitations began to

---

[4]    Former section 340, subdivision (3) provided a one-year limitations period for "libel, slander, assault, battery, false imprisonment, . . . or for injury to or for the death of one caused by the wrongful act or neglect of another." Effective 2003, that statute was replaced in part by section 335.1, which provides a two-year limitations period for "assault, battery, or injury to, or for the death of, an individual caused by the wrongful act or neglect of another." (§ 340, as amended by Stats. 2002, ch. 448 § 2.)

9

run for medical malpractice claims when the plaintiff discovered, or should have discovered, the injury and its negligent cause]; *Brown v. Bleiberg* (1982) 32 Cal.3d 426, 431–433, 437 (*Brown*) [observing that the accrual of personal injury claims under former § 340, subd. (3) "might be deferred indefinitely" under the discovery rule].)

Respondents point out that none of these cases involved a claim for medical battery or decided the issue as to the limitations period set forth in section 335.1. Neither respondents nor the trial court have explained, however, why the discovery rule should not also be applied here. After all, the primary purpose of the rule is to protect people "who, with justification, are ignorant of their right to sue." (*Seelenfreund v. Terminix of Northern Cal., Inc.* (1978) 84 Cal.App.3d 133, 138; see *Pooshs v. Philip Morris USA, Inc.* (2011) 51 Cal.4th 788, 797–798 [" 'The policy reason behind the discovery rule is to ameliorate a harsh rule that would allow the limitations period for filing suit to expire before a plaintiff has or should have learned of the latent injury and its cause.' "].) That possibility may well arise in cases of medical battery, where aggrieved patients may be unconscious at the time of the surgery and unable to realize what occurred, especially if the evidence is sealed within their body. And while we are certainly cognizant of the policy in favor of protecting parties from having to defend against stale claims, the discovery rule avoids this peril by delaying accrual of the cause of action only until the patient has knowledge of facts that place the patient on inquiry that the injury was caused by wrongdoing. (*Fox, supra,* 35 Cal.4th at pp. 807–808.)

Respondents argue, as they did in the trial court, that the statute of limitations analysis has been restricted in medical cases to questions of intentional concealment— where the defendant has affirmatively acted to hide the injury or wrongdoing—rather than the discovery rule. Their argument is unpersuasive.

Respondents rely in part on *Sonbergh v. MacQuarrie* (1952) 112 Cal.App.2d 771, in which the court ruled that an assault claim was barred under section 340, subdivision (3) because the plaintiff had not pleaded fraud, concealment or duress that prevented the plaintiff from realizing he had suffered injury. But *Sonbergh* is plainly distinguishable from this case, since there was no indication in *Sonbergh* that the plaintiff was unaware

of the *assault*, only that the assault had caused his injury.  Moreover, the court in *Sonbergh* did not even discuss the discovery rule, let alone whether it might apply to a battery claim.  Cases are not authority as to matters not addressed.  (*People v. Avila* (2006) 38 Cal.4th 491, 566; *Mercury Insurance Group v. Superior Court* (1998) 19 Cal.4th 332, 348.)

Respondents also cite to *Trantafello v. Medical Center of Tarzana* (1986) 182 Cal.App.3d 315 (*Trantafello*).  There, the court considered whether the limitations period of section *340.5* for a medical malpractice claim was tolled under that statute's provisions concerning the defendant's intentional concealment or leaving a foreign body in a patient.  (*Id*. at pp. 319–322.)  *Trantafello* did not pertain to section 335.1 or its predecessor, to medical battery, or to the common law discovery rule at issue in this case.[5]

Respondents further refer us to *Brown, supra,* 32 Cal.3d 426, in which the court found triable issues of material fact as to whether the defendant's misrepresentation of an operation tolled section 340, subdivision (3) and section 340.5 until the plaintiff discovered the negligent cause of her injury.  (*Id*. at pp. 433–434, 437.)  *Brown* did not

---

[5]     Section 340.5 was enacted in 1970 and amended by the Medical Injury Compensation Reform Act (MICRA) in 1975.  It applies to actions "for injury or death against a health care provider based upon such person's alleged professional negligence," thus carving out such claims from the reach of former section 340, subdivision (3) and current section 335.1, and explicitly restricting the time that professional negligence claims may be brought.  (*Brown, supra*, 32 Cal.3d at pp. 431–433, 437.)  MICRA generally, and section 340.5 particularly, do not apply to medical battery claims.  (*Unruh-Haxton v. Regents of the University of California* (2008) 162 Cal.App.4th 343, 356 [§ 340.5 inapplicable to claims for intentional torts]; *Perry v. Shaw* (2001) 88 Cal.App.4th 658, 668 [MICRA's non-economic damages cap inapplicable to claims of medical battery]; *Brown, supra,* 32 Cal.3d at p. 437 [§ 340.5 established a new statute of limitations for professional negligence of health care provider, but not battery].)  Nor is there any indication the provisions of section 340.5 were meant to modify the application of the common law discovery rule to section 335.1. (See *Trantafello, supra,* 182 Cal.App.3d at p. 322 fn. 6.)  Thus, even if a claim for professional negligence would be barred under section 340.5, Daley may be able to proceed on a claim for medical battery under section 335.1.  (See *Lee v. Hanley* (2015) 61 Cal.4th 1225, 1240 [although professional negligence claim against attorney was barred by the limitations period of § 340.6, plaintiff could pursue a claim for conversion].)

11

hold that the common law discovery rule was inapplicable to section 340, subdivision (3). To the contrary, the court confirmed that the rule applied to that section. (*Id.* at p. 432.)

Here, the trial court erred in concluding that the discovery rule did not pertain to the limitations period of section 335.1 for medical battery claims.

### 2. Factual Issues Pertaining to Discovery

Because the discovery rule is available for medical battery claims generally, the next issue is how the discovery rule applies to the facts of this case: specifically, at what point did Daley know facts sufficient for her to investigate with reasonable diligence whether her loss was due to wrongdoing? (*Fox, supra*, 35 Cal.4th at p. 807.) Essentially, Daley must show that, despite diligent investigation of the circumstances of her alleged injury, she could not have reasonably discovered facts supporting her cause of action by March 2013—two years before filing her complaint in March 2015. (See *id.* at pp. 808–809.)

Respondents argue that Daley was aware of her alleged harm by the time the twins died in 2003, and was also aware shortly after the 2003 surgery that the procedure was allegedly different than the procedure to which she consented, when she saw the 3–4 inch scar that was larger than what would have resulted from a percutaneous approach. Respondents thus urge that, even under the discovery rule, the limitations period commenced in 2003 and ended in 2005, so Daley's claim is time-barred.

Daley counters that she attributed the loss of her twins to the natural course of her complicated pregnancy, and she could not have realized there was any wrongdoing because the open laparotomies and open hysterotomies were performed while she was unconscious and the evidence of those procedures was "captive" under her own skin. While she observed the incision *on* her skin, her complaint focuses on incisions made *underneath* her skin—specifically, respondents cut through her abdominal wall muscles and "tore open" her uterus (which, she claims, was the cause of the infection she developed and the twins' deaths). Daley contends there was no way she could have known what respondents did inside her merely by the length of the incision (which the

12

consent form said would be "about four inches"), and she had no reason to suspect the uterine injuries until years later.

The debate over what Daley knew, whether she exercised reasonable diligence in finding out more, and what she would have learned with the exercise of reasonable diligence, are factual matters the trial judge did not resolve in the order of dismissal. We will therefore remand the case to the trial court.[6]

B. Cross-Appeal: Construing Daley's Claim as for Professional Negligence

Respondents contend that Daley's claim was not one for medical battery but for professional negligence. As such, they argue, the applicable statute of limitations was section 340.5 rather than section 335.1; and because section 340.5 requires suit to be brought within three years after injury under the circumstances here, Daley's claim was time-barred as a matter of law and the trial court should have granted respondents' summary judgment motion.

Section 340.5 provides: "In an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first. In no event shall the time for commencement of legal

---

[6] Daley attacks the trial court's dismissal order on another ground, claiming it was issued in response to what was essentially a second motion for summary judgment that did not comply with the requirements for a summary judgment motion under section 437c or a reconsideration motion under section 1008. (Citing *Kerns v. CSE Ins. Group* (2003) 106 Cal.App.4th 368, 384.) Furthermore, she complains that the trial judge's dismissal order improperly overruled the earlier order of the judge who denied respondents' summary judgment motion. (See *id*. at p. 393.) Because we reverse the dismissal order on substantive grounds, we need not decide these issues. We do note, however, that the defendant in *Kerns* had unsuccessfully moved for summary judgment before trial and later refiled an *identical* summary judgment motion during trial, in violation of section 1008. (*Id*. at pp. 377–378, 381–382, 391.) Here, respondents filed a *trial brief*, which was not identical to their summary judgment motion. And while the trial judge decided which limitations period applied and whether the discovery rule pertained to medical battery claims under section 335.1, the order denying summary judgment had not explicitly ruled to the contrary.

13

action exceed three years unless tolled for any of the following:  (1) upon proof of fraud, (2) intentional concealment, or (3) the presence of a foreign body, which has no therapeutic or diagnostic purpose or effect, in the person of the injured person."  Without evidence of fraud, intentional concealment, or the presence of a foreign body, the limitations period under section 340.5 would have expired in this case in 2006, long before Daley filed her complaint.

The question, therefore, is whether section 340.5 should be applied due to the nature of Daley's claims.  But first, we consider Daley's assertion that respondents' cross-appeal is improper.

### 1.  Propriety of Cross-Appeal

Respondents cross-appealed from the judgment of dismissal, and in their briefs challenge the denial of their summary judgment motion.  Although the denial of a summary judgment motion can be reviewed upon a valid appeal from a final judgment (§ 906), Daley urges that respondents' cross-appeal is improper because, having ultimately obtained a dismissal of the case in their favor, respondents were not aggrieved by the final judgment.  (*Westside Center Associates v. Safeway Stores 23, Inc*. (1996) 42 Cal.App.4th 507, 519, fn. 14 ["Even were we to treat [defendant's] cross-appeal as having been taken from the judgment rather than from a nonappealable order [denying its motion for summary judgment, judgment on the pleadings, and nonsuit] . . . [defendant] fails to show it was in any way aggrieved by a judgment entirely in its favor."].)

We need not decide the propriety of respondents' cross-appeal, because respondents' arguments concerning the nature of Daley's claims and the resulting limitations period may be considered for another purpose:  if respondents are correct on these points, there might be grounds to affirm the judgment from which Daley appeals.  (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19.)  We therefore proceed to the merits of respondents' arguments.

### 2. Nature of Daley's Claims

To determine the applicable statute of limitations, we must identify the gravamen of Daley's allegations. (*Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 22–23.) To do so, we begin with the distinction between medical battery and professional negligence.

#### a. Medical Battery v. Professional Negligence

To establish a medical battery, the plaintiff must prove, among other things, that the defendant performed a medical procedure without the plaintiff's consent, or that the plaintiff consented to one medical procedure but the defendant performed a substantially different one. (CACI No. 530A.) As our Supreme Court has explained: "Where a doctor obtains consent of the patient to perform one type of treatment and subsequently performs a *substantially different* treatment for which consent was not obtained, there is a clear case of battery." (*Cobbs, supra*, 8 Cal.3d at p. 239 [e.g., a patient consents to an electromyogram but a physician performs a myelogram; a patient consents to exploratory surgery but the physician performs a mastectomy], italics added; *Kaplan v. Mamelak* (2008) 162 Cal.App.4th 637, 646 (*Kaplan*) [medical battery claim stated where patient consented to surgery on T8–9 disk but defendant performed surgery on T6–7 and T7–8 disks]; *Ashcroft, supra,* 228 Cal.App.3d at pp. 610-612 [because patient's consent to blood transfusions was limited to family donors, surgeon's transfusion of blood from nonfamily donors was a battery].)

By comparison, where a doctor obtains consent of the patient to perform a type of treatment, but fails to disclose a potential complication that was a known risk yet "not an integral part of the treatment procedure," the failure to obtain *informed* consent is a failure to conform to the proper standard and thus sounds in negligence. (*Cobbs, supra*, 8 Cal.3d at pp. 239–240 [action sounds in negligence where defendant performed the identical ulcer surgery to which plaintiff consented, but failed to inform him of the inherent five percent risk of spleen injury]; *Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 324 [lack of informed consent arises when a "doctor performs a procedure without first adequately disclosing the risks and alternatives," while "a battery is an intentional

15

tort that occurs when a doctor performs a procedure without obtaining any consent"];
*Daum v. Spinecare Medical Group, Inc*. (1997) 52 Cal.App.4th 1285, 1313.)

And, of course, where a doctor obtains consent of the patient to perform a type of treatment, and performs that treatment but in a manner that does not meet the applicable standard of care, the cause of action sounds in professional negligence. (§ 340.5 [professional negligence is "a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital"]; see CACI Nos. 500, 400; *So v. Shin* (2013) 212 Cal.App.4th 652, 667 [cause of action is for professional negligence, rather than general negligence, if the conduct was taken in rendering professional services for the purpose of delivering medical care].)

Thus, three general situations support two different causes of action: (1) treatment without consent is a battery; (2) treatment without informed consent is professional negligence; and (3) treatment that otherwise does not meet professional standards is professional negligence.

While these distinctions seem clear enough, it may not always be easy to determine how they apply to a given state of facts: was the harm to the patient caused by a procedure to which the patients did not consent, or by a risk that was not disclosed, or by a procedure that was negligently performed? To answer this inquiry, critical questions may include: (1) to what, exactly, did the patient consent; (2) what treatment did the patient receive; (3) what was the difference, if any, between the treatment to which the patient consented and the procedure the patient received; (4) was that difference so substantial as to constitute a battery; and (5) was the harm allegedly caused not by a treatment to which the patient did not consent (or a treatment substantially different than the one to which the patient consented), but by a known yet undisclosed risk, or by the manner in which the treatment was performed? These are generally factual questions for the trier of fact. (See, e.g., *Kaplan, supra,* 162 Cal.App.4th at p. 647 ["whether operating

16

on the wrong disk within inches of the correct disk is a 'substantially different procedure[]' . . . is a factual question for a finder of fact to decide"]; *So, supra*, 212 Cal.App.4th at p. 669 [the nature of the contact between a patient and a doctor, and whether that contact was within the scope of the patient's consent, are questions of fact].)

### b. *Gravamen of Daley's Allegations*

In her complaint, Daley set forth the elements of a medical battery, including the factual allegation that the performed procedures were substantially different than the laser procedures to which she consented. While Daley's pleading may also contain allegations suggesting that professional negligence would be a potential cause of action, it cannot be said that Daley failed to allege a cause of action for medical battery. Indeed, the court overruled respondents' demurrer on this point, notwithstanding respondents' argument that the complaint failed to state facts showing that the laser ablations were substantially different than the procedures to which Daley agreed. (See *Grieves v. Superior Court* (1984) 157 Cal.App.3d 159, 165–166 [allegations sounding both in negligence and in battery predicated on conditional consent—that plaintiff consented to a tubal ligation only upon the condition her baby was born without any abnormalities—is sufficient to state a cause of action for battery for purposes of demurrer].) Respondents have not established that the gravamen of Daley's *allegations* is professional negligence.

### c. *Summary Judgment Ruling*

In their summary judgment motion, respondents contended that no battery occurred because Daley received "exactly the procedure that was discussed with her." Thus, they urged, in light of the *evidence* they presented, the gravamen of Daley's claim was professional negligence. Based on the parties' respective statements of material facts, the court ruled there were triable issues as to whether respondents performed medical procedures without Daley's consent and whether the procedures performed and the procedures for which Daley gave consent were substantially different.[7]

---

[7] Respondents filed a motion to augment the record with documents related to the summary judgment proceedings. We grant the unopposed motion and order the record augmented to include the documents attached to the motion.

17

Respondents fail to establish that the court erred in concluding there were factual issues on these key matters. They therefore fail to show that Daley had no medical battery claim as a matter of law, or that the gravamen of Daley's claim was necessarily professional negligence.

### d. Trial Court Ruling

In their trial brief, respondents contended that, based on their view of the evidence, Daley's claim was for professional negligence rather than medical battery because using the laparotomy and hysterotomy procedures to gain access to the intrauterine cavity, rather than taking a purely percutaneous approach, was a matter of the physicians' professional judgment and experience. The trial court observed that Daley's claim might have been better alleged as professional negligence, but allowed Daley to proceed on her medical battery cause of action. We find no error.

Respondents' reliance on *Larson v. UHS of Rancho Springs, Inc*. (2014) 230 Cal.App.4th 336 (*Larson*) is misplaced. In *Larson*, the plaintiff purported to assert causes of action for battery and intentional infliction of emotional distress, based on allegations that the defendant grabbed his arm, pried open his mouth, and punched, lifted, and grabbed his chin, face, and mouth in preparing plaintiff for a medical procedure. (*Id*. at p. 345.) The court noted that, when the question is which statute of limitations applies, courts "must focus on the nature or gravamen of the claim, not the label or form of action the plaintiff selects." (*Id*. at p. 347.) In *Larson,* the "allegations challenge[d] the *manner* in which [the defendant] rendered the professional health care services he was hired to perform; they [did] not allege intentional torts committed for an ulterior purpose." (*Id*. at p. 351, italics added.) Accordingly, the gravamen of the claim was professional negligence and the limitations period of section 340.5 applied. (*Ibid*.)

*Larson* is plainly distinguishable from the matter at hand. The complaint in *Larson* was essentially that a physician was too rough in administering anesthesia. Daley does not claim respondents were too rough or otherwise at fault for the manner in which they performed the laparotomy and hysterotomy. To the contrary, Daley explicitly

18

disavows any such claim. Instead, Daley argues that the laparotomy and hysterotomy should never have been performed at all, because she never consented to them.

In the final analysis, the parties are urging competing inferences as to what Daley consented to, and whether and how the performed procedures were different than what she consented to. Daley insists her claim sounds in battery, because respondents deliberately performed open laparotomies and open hysterotomies, even though those procedures were substantially different than the percutaneous surgery to which they knew she consented. Respondents insist Daley's claim is for professional negligence—the manner in which a procedure to which plaintiff consented was performed—since she consented to two laser ablations to treat her TTTS and complains only that the surgeons performed that surgery using incisions (laparotomy and hysterotomy) rather than a puncture (percutaneous), and those two approaches do not reflect substantially different procedures. As the court implicitly found in denying respondents' summary judgment motion, the issues cry out for consideration by a trier of fact who can observe the witnesses and evidence at a trial. Because the appellate record and the parties' appellate briefs do not equip us to rule that the procedure performed on Daley was not, as a matter of law, substantially different than the procedure to which she consented, we cannot say that the court erred in concluding there was a triable issue precluding summary judgment, that the trial judge erred in construing Daley's claim as one for medical battery, or that the gravamen of Daley's complaint was professional negligence.[8]

---

[8] Although we must look beyond the label a plaintiff applies to its claims and examine their substance, it also seems that, at least at this juncture in the proceedings on the eve of trial, Daley should get to decide what causes of action she will seek to prove. While respondents believe the procedures Daley received were not substantially different from the ones to which she consented and thus she cannot *prove* medical battery, that does not mean her claim is not *for* medical battery. And if Daley ends up failing to prove she received a substantially different procedure, she will lose on the merits of her battery claim anyway; her claim will not be transformed into one for negligence.

19

C. Conclusion

The court did not err in deciding that section 335.1 applied to Daley's claim for medical battery, but it did err by dismissing Daley's case on the ground that the discovery rule does not apply to medical battery claims under section 335.1 as a matter of law. Accordingly, we will reverse the judgment and remand for further proceedings consistent with this opinion.[9]

III. DISPOSITION

The judgment is reversed.

---

[9] The parties spend little time on Daley's claim for intentional infliction of emotional distress. As a general matter, the two-year statute of limitations begins to run once the plaintiff suffers severe emotional distress. (*Wassmann v. South Orange County Community College Dist.* (2018) 24 Cal.App.5th 825, 852-853.) Here, Daley arguably first suffered severe emotional distress when her twins died in 2003. However, contrary to respondents' suggestion, *Wassman* did not bar application of the discovery rule, but merely discussed other types of tolling. In any event, the order of dismissal in this case did not make any explicit findings in regard to the limitations period for the intentional infliction of emotional distress claim. We reverse and remand as to that claim as well.

20

_____

NEEDHAM, J.



We concur.



_____

JONES, P.J.



_____

BURNS, J.



*Daley v. Regents of the University of California* / A153501

A153501 / Daley v. Regents of the University of California

Trial Court: Superior Court of the City and County of San Francisco

Trial Judge: Suzanne R. Bolanos, J.

Counsel: The Killino Firm, Eileen G. Mungcal, Jodi C. Page, and Jeffrey B. Killino; Arias Sanguinetti Wang & Torrijos, Elise Sanguinetti for Plaintiff and Appellant.

Cole Pedroza, Kenneth R. Pedroza, Matthew S. Levinson, and Cassidy C. Davenport; Donnelly Nelson Depolo & Murray, Donnelly Nelson Depolo Murray & Efremsky, David A. Depolo, Sonja M. Dahl, and Frances Burns for Defendant and Respondent.